## NEGLIGENCE AS BETWEEN RAILWAY ENGINEER AND TOWERMAN.

[Circuit Court of Lucas County.]

THE LAKE SHORE & MICHIGAN SOUTHERN RAILROAD COMPANY
v. JOHN BURTSCHER.

Decided, October 7, 1905.

*Principals, Vice-Principals, Superior Servants and Fellow-Servants— Duties, Authority and Discretion of a Towerman—To Some Extent Analagous to those of a Vice Yardmaster or Train Dispatcher— Whether a Superior or Fellow-Servant of an Engineer a Mixed Question which Should Go to the Jury, When—But Becomes a Question for the Court, When—Con-Association and Separate Department Principle—Negligence and Contributory Negligence—Railway Signals—Verdict of $13,500 for Disabled Engineer.*

1. Whether or not, under the circumstances of this case, a towerman was negligent in giving the signal which he did give, was a proper question for the jury.
2. Where there is a conflict of evidence as to custom in the moving of trains, it can not be said the jury found there existed a custom which exonerated the towerman of negligence, where it was equally possible under the testimony to have found that it was his negligence in the giving of signals which caused the accident.
3. The con-association rule has not been adopted in Ohio, and the separate department principle only to a limited extent and in such a manner that it is interwoven with the superior servant doctrine.
4. While in certain cases it may be a question of law and entirely for the court to determine as to whether the negligent employe was the superior of the injured one, the rule is still in force in Ohio that the question whether one servant is the superior of another should be determined by the evidence presented in each case.
5. Within a limited area the duties of a towerman are analagous to those of a train dispatcher, and under the current of authority he stands in the position of superior of an engineer; and where the negligence charged by an injured engineer was in the signals given by the towerman, a verdict supporting that contention will not be disturbed on the ground that they were fellow-servants.
6. The fact that the negligence of the engineer of the second engine in the collision contributed to the accident, would not relieve the railway company from liability to the injured engineer of the first

engine, where the primary cause of the accident was the negligence of the towerman.

7. A verdict of $13,500 for injuries of a disabling character to a locomotive engineer in the prime of life, though perhaps larger than the judges of the reviewing court would have named, does not under the circumstances of this case indicate passion or prejudice on the part of the jury, or any such error in computation as would require a remittitur.

WILDMAN, J.; HAYNES, J., and PARKER, J., concur.

This is a proceeding in error to reverse the judgment of the Court of Common Pleas of Lucas County, on a verdict in behalf of the plaintiff below in the amount of $13,500. The record is very voluminous and a large part of the time of the court has been occupied in its consideration. At the conclusion of the plaintiff's testimony, a motion was made by the defendant to arrest the testimony from the jury and direct a verdict, upon the ground that there was no actionable negligence shown against the company and the further ground that the negligence of the plaintiff himself contributed to the injury complained of. This motion was renewed by the defendant at the close of the introduction of the evidence. The motions were overruled by the court below, the case went to the jury, and the jury rendered the verdict which I have stated.

The substantial issues, as raised by the pleadings and receiving the attention of the parties on the trial were, first, whether one McGrevy, an employe of the defendant company, was the superior of Mr. Burtscher, the plaintiff; second, whether McGrevy was guilty of negligence directly causing the injury to the plaintiff; and, third, whether or not the plaintiff contributed to the injury by his own negligence.

This is the second time that this case has been brought to the attention of this court. I was not, on the other occasion, a member of the court as then constituted, and have had no familiarity with the case, except as I gather it from the present record and consultation with the other judges of the court, my associates. I will not attempt any elaborate review of the evidence bearing upon the two questions last mentioned, the claim of contributory negligence and the claim of negligence on the

part of McGrevy. It is sufficient to say that after a very careful examination of the present record, which has required the reading of the whole of it, the court are unanimously of the opinion that there was a fair question of fact to be presented to the jury and considered by them upon each of these issues, the issue of claimed negligence of Mr. Grevy, the towerman, and the claim of contributory negligence of the plaintiff.

When the case was in this court before for review of the record, the case as then presented seemed to the circuit court to warrant the holding which was made, that the verdict of the jury was not justified by the evidence; that the disclosed facts showed contributory negligence on the part of the plaintiff and failed to show negligence of the defendant company through its servant, McGrevy. There seems to have been a substantial change in the evidence, not necessarily a contradiction, but a supplementing, a supplying of facts necessary to a better comprehension of the conditions existing at the time of the accident to Burtscher.

Counsel and parties in the case are so familiar with the general facts that it is not necessary, perhaps, that a review of them be given. The statement in the opinion of Judge Parker upon the former hearing would suffice to make the present one intelligible; but it is perhaps well to say that Burtscher was injured while in the employ of the company as an engineer; that he was at the time engaged in taking a train of cars off upon certain of the tracks in the Toledo yard, which have been variously designated in the record here, and which may be described as principally consisting of main or other tracks, but including also a track known as a cross-over and certain side-tracks. He had come into the yard for the night, and in passing over this cross-over track to one of the side-tracks, where it was intended to leave the train for the night, by the mistake of the switchman, and whose mistake it is not important to ascertain, the train started to go upon a track which it was not intended to occupy, whereupon the conductor instructed the engineer to back out. The engine was at the eastward end of the train—the train had been moving to the west; the tender

of the engine was toward the east, so that the engine was backing when the engineer proceeded to obey the order of his conductor, and in backing he proceeded upon the cross-over track, or was about to proceed on it toward what is known as the westbound track of the two main tracks that have been mentioned. Some distance to the east, McGrevy, the other employe hereinbefore mentioned, was engaged as a towerman, having some charge of the tracks or trains as they came into the yard, and the giving of various signals, by semaphore or by lights, and perhaps in some other ways, a matter to which I will invite attention later.

As the train on which Burtscher was engineer had either began to back or was about to back, an incoming train from the east signaled for the switch by whistle, and the towerman thereupon changed the switch lights from red to white. At the time when the train on which Burtscher was engineer had passed into the yard he had been given the red signal and, as he claims, the signals remained red at the time he began to back, which, if a fact, as testified to by several witnesses, would justify him in the free use of the yard for switching purposes before passing upon this cross-over track.

An important question which arose upon the former hearing, and which has also arisen upon this, was as to the precise location and direction of movements of the train on which Burtscher was the engineer at the time when the signal was changed from red to white, and it is upon this point that the testimony seems much clearer to the minds of the court than upon the former trial. Burtscher testifies positively that at the time when he began to back, the red lights were still showing. He claims that he did not see the white light at all, and indeed, if he began to back while the red light was still showing, it is reasonable to suppose that as he proceeded in an angling direction across the track the thrust of the tank attached to his engine; and which, as I have said, was to the eastward of the engine, would obstruct his view of the switch light. The first intimation he had of any danger came from his fireman, who called out some words of warning.

Upon the change of the lights by the towerman, the engineer in charge of the engine attached to the train approaching from the east proceeded on his course; he was at first proceeding with considerable speed, that speed was slackened until, as he claims, I believe, his engine had come practically to a stop, perhaps to a full stop at the time when the two trains collided.

When Burtscher discovered that it was impossible to avoid a collision, having taken all the precautions that were in his power for the stopping of his train, he attempted to escape through the cab window, and in doing so he received the injury of which he complains.

It is the view of the court upon the evidence as now presented, taking the testimony of Burtscher that his train was in motion, that he had begun to back before the white light was thrown against him, corroborated as we believe it is by the result of a careful examination of the relative speed of the two trains and their location, that it is improbable that Burtscher's train moved the entire distance from the point where it had stopped when the conductor gave the order to back to the point of the collision, after the white light was thrown; and we think that the jury were justified in coming to the conclusion, as they probably did, that the white light was thrown after Burtscher had begun to back. If this is true, without any further consideration of the question, it would seem to relieve Burtscher of any charge of contributory negligence. And upon precisely the same condition, and because of the same fact, the situation is changed as regards the conduct of the towerman himself. The towerman's testimony upon the other trial was not altogether clear that the white light was thrown before the backing began. Upon the present trial it was very vague and uncertain. He does not know whether Burtscher's train was moving or standing still at the time when the white light was thrown. He knew this, that Burtscher's train had come into the yard and that as long as the red light was showing that Burtscher had the right to use this cross-over track to the fullest extent. Under these circumstances, we think it became a fair question whether the towerman was not negligent in throwing the white light so

as to permit the progress of the train from the east. He threw the white light; whether he was negligent or not is not a question for the court. We have no disposition to invade the province of the jury; and we do not conclude that the finding of the jury in this respect is so clearly against the evidence as to warrant a reversal.

More emphasis was placed by counsel in argument upon the remaining question, and that is the question as to whether or not the towerman stood toward Burtscher in such a relation as to make the company liable for the towerman's negligence; or whether he was merely a fellow-servant.

Upon the former hearing, the judge announcing the opinion of the court suggested that this was a mixed question, one which ought to be permitted to go to the jury; that is, the determination whether the towerman had any° authority over Burtscher; and to that opinion we are still disposed to adhere.

It was argued, going back for a moment, by counsel for the plaintiff in error, that Burtscher had testified, and it was the theory of Burtscher's counsel below, that even if the white light was thrown before he began to back, and if he knew that the white light was showing, he had a right to back as far to the eastward as a certain point which has been designated as the inner tower; and it is claimed in behalf of the plaintiff in error that if that be so, that the towerman, knowing of that custom, knew also of another incident to the custom, that the engineer of the incoming train, by virtue of the custom, would stop at the inner tower, would not come into the yard, would not come to the point where the collision occurred, so that Burtscher would be defeated in his claim of negligence of the towerman by the very theory that he was asserting, which would excuse himself or exonerate himself from any claim of negligence contributing to his injury.

But the trouble with that argument, as the court considers it, is that we do not know that the jury adopted this theory of Burtscher or of Burtscher's counsel. The jury were entitled to a consideration of all of the evidence in the case, whether offered by the plaintiff or defendant. They were entitled to

consider all the theories argued, and peradventure the jury may have failed to find that the custom was as claimed by Burtscher's counsel or by Burtscher. There was a conflict of evidence upon that point; it was no means a settled and undisputed proposition; so that the jury may well have found that there was no such custom; or they may have failed to find there was such a custom; and they may have based their verdict upon the other point, to which I have called attention, that the white light was not in fact shown until after Burtscher and has train had begun the eastward movement; and they may have found that it was the negligence of the towerman then to change the lights.

It may be said in passing that it is well settled by the adjudications, both in this state and of those elsewhere, that if the towerman was negligent, and if his relation was such to the company and to Burtscher as to make the company responsible for his negligence, if his negligence stood alone, without the negligence of any other employe concurring, that the responsibility of the company would not be lessened by the concurring negligence of some co-employe, some fellow-servant of Burtscher, as, for instance, engineer Fry of the westbound train; I need say nothing further on that point. If engineer Fry himself was guilty of negligence, and that negligence contributed to the unfortunate result, the injury of Burtscher, still the company would be relieved from any liability on account of the towerman's negligence.

Before glancing at the evidence, let me call attention to some of the principles which have been recognized by the various courts of the states. In the 12th Amer. & Eng. Ency. of Law (2d Ed.), page 946, is a paragraph in which this language appears:

"An important and universally accepted restriction of the fellow-servant rule is what is known as the 'vice-principal limitation,' which holds the master liable to one servant for the negligent performance by another of the personal duty which every master owes to his servants.

"The law imposes upon the master certain duties which concern the safety of his servants, and while he may, of course, delegate the duties to another one, his doing so in no wise affects

his responsibility for their proper performance. If one servant is injured by reason of the negligent performance of one of these duties by another servant, to whom it has been delegated by the master, the master can not escape liability on the ground that the negligence was that of a fellow-servant. In other words, where a servant is intrusted with the performance of one of the master's personal duties, he is, with respect to that duty, a vice-principal or representative of the master, who will be liable to another servant for the negligent performance by the vice-principal of the delegated personal duty to the same extent as for his own negligence.''

On page 948, the text-writer distinguishes the relations of the vice-principal and superior-servant as follows:

''While the courts in some of the United States where the superior-servant limitation has been adopted, employ the term vice-principal as meaning a superior servant, this is neither the correct nor the common use of the term.' There is a marked and very clear distinction between a superior-servant and a vice-principal. A superior-servant is, generally speaking, one who exercises the authority of direction and control over other servants and may or may not be charged with the performance of any of the master's personal duties. On the other hand, the status of a servant as a vice-principal, in the proper sense of the term, is in no wise dependent upon his rank or the grade of his employment; it depends solely and wholly upon the character of his duties. If he is charged with and is in the performance of one of the master's personal duties, a servant is a vice-principal, regardless of whether he occupies a position superior or inferior to that of other servants.''

This rule or principle has not been very clearly elucidated perhaps in any decision in Ohio. As stated by this writer, there has been a confusion in the minds of many judges as to the distinction to be observed between a vice-principal and a superior-servant, and sometimes perhaps in some of the reasoning and dicta of the judges of our own Supreme Court there has not been kept clearly in mind this distinction. The doctrine of superior fellow-servant is essentially an Ohio doctrine, although it has been adopted in several other states. It has been repudiated in many.

There is another doctrine as to the liability of the employer to the employe for the negligence of fellow-servants, which has been held in some of the states, to-wit, that the company is not relieved from liability by the fact that a negligent employe is not a superior, is of the same grade perhaps of the one injured, provided he is in a separate department or branch of the service, so that in the work of the injured employe he is not brought into such close relations of association with the negligent one as to make it reasonably to be expected that he assumed the hazard of such negligence when he, himself, entered upon the duty. This principle has been especially recognized by the state of Illinois, and is the basis of the two decisions cited by counsel for the defendant in error here, rendered by the Illinois Supreme Court and Court of Appeals. I have those cases before me, but I will not stop to read them. It is really but one case that was carried from one court to the other (*The Chicago & Alton Railroad Company* v. *Wise*, 206 Ill. Rep., 433, and 106 Ill. App. Ct., 114). The reason for the citation of this case to the court is probably found in the fact that it is about the only case that counsel have been able to find involving the claim of negligence of a so-called "towerman," one like Mc-Grevy, the employe in the case at bar, who was in charge of a tower, occupying it and having duties similar to those which were placed upon McGrevy. But the case has no application here for the reason which I have suggested, that it is based upon the con-association principle adopted and recognized by the Illinois courts. It is not held in the Wise case by the Illinois courts that a towerman was the superior of the trainman who was injured. But the court simply holds that he was not a fellow-servant, whose negligence was assumed by the injured one, for the reason that he was in a separate department or branch of the company's service; that is, that his relation was not so close to the injured man that it might be said that the injured man had assumed the hazard by working with him or near him, and therefore the company was held liable.

Our own Supreme Court, on the contrary, has not adopted the con-association rule. To a limited extent the separate depart-

ment principle has been recognized by our statute of 1890, and even there it is so interwoven with the superior-servant doctrine that it does not aid us in our present inquiry.

From an examination of the cases cited by the Century Digest and the various text-books to which we have any access, there seems to be almost an utter chaos or conflict of authorities as to the liability or non-liability of companies for the negligence of telegraph operators, train dispatchers, switchmen and persons in like employments, having some connection with the movement of trains whereby men upon the trains received injuries; but I think many of these cases may be reconciled or accounted for by the differences in the views of the different courts upon this con-association principle, this separate department principle, and I will not stop to review them.

The case of *Whaalan* v. *Mad River & Lake Erie R. R. Co.*, 8 Ohio St., 250, is the leading Ohio case along the line of the rejection of the con-association rule. I read from the syllabus as follows:

"Where a servant is injured in his person through the carelessness of a fellow-servant engaged in a common business and employment, and no relation of subordination or subjection existed between them, and the employer is himself guilty of no fault, such employer is not responsible for such injury.

"Where the injured party is engaged in the repair of a railroad track, which is then in use for the running of trains, and the party through whose negligence the injury occurs is a hand employed on the engine and tender of a passing train, they are engaged in a common business within the scope of the above rule."

On page 255 Judge Brinkerhoff, speaking for the court, says:

"It has been suggested, however, that this case is to be excluded from the operation of the general rule, in respect to the liability of the employer for injury to a servant by the negligence of a fellow-servant in a common employment, on the ground that the servants here were engaged in different and distinct departments of duty, having no connection with each other; and this suggestion receives some countenance from the remarks of the judges *arguendo* delivering the opinion of the court in the Indiana cases above noticed."

[My impression is that Indiana afterwards repudiated this doctrine, but I will not state it positively without a little more critical examination than I have given to the cases.]

"For although in both these cases the court holds the plaintiffs to be, under the circumstances, passengers—and contend that their decisions may well be sustained on that ground—yet in their discussion of the questions involved, they argue that the fact of the plaintiffs being employed in different and distinct departments of duty, would relieve them of the application of the general rule, although they might not have been passengers. The validity of this argument we, in this case, are perhaps not called on either to affirm or deny, for, if we admit that there may be different departments of duty in the business, or a common employment so distinct from each other as to require an exception to be made to the application of the general rule, still we must hold, on the authority of well considered adjudications, that this is not a case to create such exception.

"Thus the case of *Farwell* v. *The Boston & Worcester R. R. Co.*, 45 Mass., 49, was an action against the company for an injury to the engineer of a locomotive, arising from the carelessness of a switch tender. It was held, notwithstanding the point was urged upon and received the particular attention of the court, that the plaintiff could not recover. But we are unable to see wherein the departments of duty of a fireman and of a track repairer are more distinct and independent of each other, than are those of an engineer and switch-tender."

The court does not indicate in any way as to what sort of difference between the parties would be so wide as to bring them within the rule applying in other states. We might suppose, however, that the legal department, for instance, of a railway company was so distinct from the department operating its trains, in all its functions, all its duties, as to call for the application of the con-association rule, even in Ohio; but we have had no express illustration of the distinction which Judge Brinkerhoff by implication recognizes, *Whaalan* v. *Ry.*, *supra*.

The superior-servant doctrine, however, does obtain in Ohio, first finding recognition in the case of *The Little Miami R. R. Co.* v. *Stevens*, 20 Ohio, 416, and in the case of *The Pittsburgh, Ft. Wayne & Chicago R. R. Co.* v. *Lewis*, 33 Ohio St., 196, the court holding, in substance, that the question as to whether one

servant is the superior of another is one to be determined by the evidence in each case. I think in *Ry.* v. *Margrat*, 51 O. S., 130, this latter principle is recognized. So far as I know there has been no rejection of this principle in later adjudications. It is' true that if the facts are undisputed, it may become a question of law for the court, a question entirely for the court to determine, as to whether, in a particular case, the negligent employe was the superior of the injured one.

This brings me to an examination of some of the evidence, to determine just what the facts are here. This is a matter which was not passed upon at the former hearing in this court, and which it was not necesary to pass upon in the view then entertained by this court, in the case as then presented. In the testimony of the witness Mahony, found on page 26 of this record, in describing the duties of the towerman, he says:

"If he felt like letting a train come in on the north and south bound, it was his place to let them in, if he saw the tracks were clear."

Whether this witness was right in this or not, that is his evidence, and the expression implies a certain amount of discretion on the part of the towerman as to letting the train come in even if he saw the track was clear.

On page 58, the witness Atkinson was examined. He had acted in various capacities for the Lake Shore Company, as switchman, pony conductor and yardmaster at different times, and he says he was familiar with the construction of the tracks in the vicinity of this tower in the year 1901, the time of this injury. He testifies on page 60 in answer to this question:

"Q. What, if any, notice was the towerman accustomed to have before letting in such train? A. Why, he used to have an order if everything was all clear and all right, for to let them come ahead.

"Q. From what source? A. From the yardmaster, or some of the assistant yardmasters or something like that."

Now, on the occasion in question there was no direct instruction given to the towerman by the yardmaster. The towerman was acting entirely in recognition and response to the signal of

the incoming train if he heard it. He says he did not hear it, does not remember how his attention was called to it. But it seems reasonably certain that his attention was called to the approach of the west bound train, either by its whistle, or seeing or hearing it approach, and that thereupon he threw the white light, without any instruction from the yardmaster whatever, and this seems to have been entirely within his authority.

On page 61 this question is asked:

"Q. You may tell us from your experience as a conductor, switchman and yardmaster there, what duties the towerman in the year 1901, during and before November, customarily exercised in that yard?

"THE COURT: The question is, what did the towerman do in November, 1901; what did he customarily do? A. If he was wanting a cross-over on Swan Creek, or if he was coming out Swan Creek, it was his custom for him to change those cross-overs, and let us in or out of there as he saw fit."

The words "as he saw fit" were objected to and stricken out by the court, but the testimony stood so far as stating what his custom was in changing the cross-overs and letting trains in and out. Then this question was asked:

"Q. Suppose a train wanted to go west over the regular west bound track, and for some reason it was blocked, so that it could not get out, what was the custom and practice there in 1901, prior to November and including November, in the operation of the trains? A. In case the north bound was blocked and you wanted to send a train out over the north bound?

"Q. Wanted to send it west? A. Why, the towerman would block what we call tower Z and run the train over the south bound or the north track."

Then there is some further testimony as to his general custom, but nothing that I need read. On page 63—if I had time I would like to go further back—this question is asked:

"Q. From whom do these orders come? A. From the general yardmaster or his assistants.

"Q. How about the towerman? A. And the towerman; it was under his jurisdiction. If he would be working by the tower, conveniently, orders always come from the towerman, if we were in the way, to get out of the way.

"Q. When you received orders from the towerman, what were the crews accustomed to do? A. Obey those orders.

"Q. Was there a telephone in the M. C. tower in the year 1901? [That means the Michigan Central, I suppose, and that was the tower occupied by McGrevy]. A. I believe so.

"Q. Connected with what? A. The general yardmaster's office, also with Swan Creek, also at tower Z, at the intersection of the main line track and the Detroit branch tracks."

Joseph Kilborey, the switch tender, used, as I find on page 66, this language in his testimony in answer to this question:

"Q. In 1901, November, and before, what did the towerman do in the performance of his work there? A. Why, his duty was to keep in contact with all trains and see that the movement of all the trains over the road would be right.

"Q. Suppose a switch engine approached on the Swan Creek track, called for the cross-over and at the same time one came down from the water plug track and called for the cross-over, what was the towerman in the habit of doing? A. One coming down and the other coming out? Why, the fellow that come out and had cars, hold him there and make the light engine come in, let him come in."

He seems to be speaking of the duty of the towerman as to the direction and selection of trains coming in and going out.

On page 66 we find this question:

"Q. What, if any, warning or notice is the towerman accustomed to give trains in the vicinity of the tower? A. Calling out."

We have then evidence of signals by the throwing of lights; we have the fact of a telephone in his office for communication with the other points; we have the fact testified to in another place as to his throwing of the semaphore in daylight, and we have now the instructions or signals by word of mouth. Then this question is asked:

"Q. What, if any, instructions have you heard the towerman give them in 1901, in the vicinity of the tower? A. Tell them to get out the way of this train coming.

"Q. What did the men do when the towerman told them these things? A. Get out of the way for them to come on."

On page 67 this question is asked of the witness Moore:

"Q.  From whom did the towermen receive their instructions? A.  From the yardmaster.

"Q.  You may tell the jury what duties or what work the towerman at the M. C. tower did while you were yardmaster? A.  Why, he operated switches and targets to a certain extent both east and west at that point and had control of them.

"Q.  Go on and explain more fully what the towermen were in the habit of doing and did in carrying on their work in this tower, when you were yardmaster; what were the duties of the towermen; give it fully? A.  The duties of the towermen were to operate switches that were connected by levers in the tower.

"Q.  You may state in the practical carrying on of this work what the towermen actually did, if anything, in the matter of directing the enginemen in their work, to your knowledge as yardmaster, and with your approval? A.  Enginemen in charge of engines are governed by both signals and the switches given to them by the towermen and also by signals.

"Q.  Go on and tell what, if any, direction by word or otherwise, they were in the habit of giving them, to your knowledge, during the time you were engaged as general yardmaster. A. He had the general direction of all trains to and from the point and also from other points, by telephone that was on his line in the yard.

"Q.  I do not understand that answer; you say he had the direction, what do you mean by that? A.  Well, the direction is this; that he could direct the train to come from Broadway, or go to Broadway, by telephone, and he had the authority to do so, and he had the authority to let trains in and out, and to hold trains, according to his instructions from the yardmaster.

"Q.  Did conditions arise there frequently when switching engines would be working in the vicinity of the tower, and not come under the observations of the yardmaster, when you were yardmaster? A.  Yes, sir."

On page 71 this question is asked:

"Q.  While you were acting as yardmaster what were the enginemen in the habit of doing when the towermen gave them any instructions, if they did give them such instructions, that is, to obey them or not? A.  They were controlled by the instructions and signals.

"Q.  Did they obey any of his instructions? A.  Yes, sir."

He says in answer to another question (it is a very long one

and I will not read it, partly by the court and partly by counsel) :

"A.   Not only over the switches he has control over, but to give him written authority and control of trains from Swan Creek to Broadway.   They had authority to do that.   They were given instructions to give enginemen written instructions relative to the use of opposing tracks, have the authority to protect them on either track at night in the yard."

There is a good deal more on this line.   I will not attempt to call attention to all of it which has come under our notice.   I will pass along to some testimony on page 77:

"Q.   Would the yardmaster be advised of it?   A.   No, not certain points.   The yardmaster or assistant yardmaster would advise the man at Swan Creek in the tower or the man at Michigan Central junction in the tower.
"Q.   Don't you know that before the man used the west bound main track for switching purposes, wouldn't you be advised of that fact, before he began to use it?   A.   No, sir.
"Q.   That was left entirely to the discretion of the pony conductor?   A.   That was left entirely to the towerman.
"Q.   The towerman did not do any switching, did he?   A. No, sir, but he—
"Q.   In the first place, if you desired to use the west bound main track for switching purposes, the towerman did not have anything to do with it; in the first place, he did not determine whether they were going to use it or not?   A.   But it certainly was necessary for him to know it before he gave them the switch.
"Q.   He would be advised?   A.   He would be advised by the conductor that wanted to use it.
"Q.   Who would advise him?   A.   Either the conductor or the enginemen."

Well, that goes to the custom of calling for the signals and the action of the towerman upon receiving such notice.   This seems to be cross-examination.   On page 78 this question is asked (speaking of the switching of trains) :

"Q.   Suppose it comes through the cross-over by the water plug track to the other track, how does the towerman know what they are going to use, unless he is notified?   (This has reference to the train upon which Burtscher was employed).   A.   A tow-

erman is supposed to let a train come into the yard, without he receives instructions from the yard master.

"Q. I am speaking of a train that has passed into the yard over the cross-over and suddenly stops; he would not know what they stopped for? A. No, sir. He has no jurisdiction over them after they pass that point.

"Q. (By the Court): After they pass the water plug switch? A. After they pass any point where they can not stop them; after they pass the west block."

This perhaps bears more directly upon the claim of negligence of the towerman than it does to his relationship to the company or to Burtscher. He indicates there, as testified in another place, that he has some discretion as to the movements of trains. Then there is some further testimony about the giving of hand signals by the towerman. He may give the distance signal, may throw the lights, in the daytime throw the semaphore, he may signal by telephone, he may give written instructions, and he may give signals, as we have already learned, by word of mouth; he may also give signals by some motion of the hand.

On page 91, Mr. Burtscher, the plaintiff, testifies in answer to a question:

"Q. During the years you worked there after this tower was put in, you may state what the towerman was in the habit of doing and accustomed to do in carrying on his work, so far as you were concerned? A. Well, he had control of letting in trains and control of trains from coming into the yard by signals, home signals, and had this much control that he would—
"(Objection).

"Q. What did he do, do not use the word 'control,' just what he did? A. He operated those signals and targets operating the switches for trains to move in either direction on that semaphore."

I have reference to a number of pages 90, 91, 92, 100, but I will not stop to read from them. On page 115 this question is asked:

"Q. During the progress of your work there for several years you worked in that vicinity of that tower, what, if any, practice was there as to the towerman giving verbal notice or word from the tower? A. I have received it.

"Q. Giving instructions by voice, by calling out from the tower? A. Why, yes; from the tower.

"Q. Was he accustomed to do it? A. Quite frequently.

"Q. What were some of those things, in what instances were those? A. Why, if there was some engine would be in the way switching through that portion of the track in his jurisdiction, if it became necessary—

"THE COURT: Q. What did he tell you—to get out of the way? A. Why, yes. He would say, 'Get out of the way' on the stone run or any run come, he would say, 'Go ahead.'

"MR. THATCHER: Q. What would you do under those circumstances? A. I would go as far as I could, whenever my conductor—get out of the way if I could.

"Q. Did you do this when the yardmaster or his assistants were present? A. Yes, sir.

"Q. When those orders were given? A. Yes, sir.

"Q. Where the yardmaster could hear the orders? A. Yes, sir."

James B. Cryan, an assistant yardmaster, testified in relation to the same matter. After testifying that the pony enginemen and crews were under the authority and instructions of the yardmaster and assistants, the question was asked:

"Q. Who else was accustomed to give instructions, if any one, to the crews of pony engines about their work there? A. Nobody but the yardmaster in particular. Of course he might send somebody out to notify them, some switch-tender to tell them what to do.

"Q. How about the towerman? A. Or the towerman if they were working in that vicinity.

"Q. What did the towerman do in cases of that kind then? A. He would notify them, whatever the instructions were, if they were to get out of the way, clear the track, he would notify them.

"Q. Suppose the yardmaster's office did not have notice that a train was approaching, but there were several switch engines moving in the vicinity of the tower, in different directions, where the towerman has the switches to be operated from his levers, who directed the movements of the switch engines on such occasions? A. The towerman.

"Q. What were the engine crews and yard conductors and brakemen accustomed to do under these conditions? A. They would have to obey him.

"Q.  Obey the towerman?  A.  Yes, sir.

"Q.  Was the towerman in the habit of keeping things moving through there, is that his business?  A.  That is his business.

"Q.  Avoiding blocking of tracks and so on?  A.  Yes, sir."

It is pretty hard to distinguish from this testimony and a great deal more of it along the same line, between the duties of what we might call a towerman and a sort of a vice-yardmaster, or vice-company, or vice-principal, or we might say, to put it in another form, that his duties are very similar on a small scale to those of a train dispatcher.  He does not have the general direction of the movement of trains, but so far as the yard is concerned, in permitting the trains to come in there and go out of the yard, he seems to have control in the absence of the yardmaster, or, as possibly appears in some cases, when the yardmaster is present, the yardmaster not interfering with his giving some directions.

There is much more of this evidence that bears upon this question that I should be glad to read in view of the importance of the question, and perhaps its practical novelty in this state, but I am taking so much time that I will be obliged to omit an examination of much of the testimony that I have read and which I think bears upon the point.

The testimony of the witness Arnold on pages 121 and 122 may be referred to.  Some of the testimony of Mr. McGrevy indicates that he had some discretion, some power, such as has been testified to by other witnesses.  On page 203 this testimony appears:

"Q.  How did you, as towerman, know whether the trainmen were going to use the west bound main track for switching purposes or any particular movements?  A.  You do not know unless you are told.

"Q.  According to the practice and custom there, who was it informed you of their using it?  A.  Most invariably the men that were using it.

"Q.  Who would that be.  A.  The conductor who happened to be switching there.

"Q.  How long was that the custom while you were there as towerman?  A.  All the time while I was there.

"Q. I want you to state whether during the time that you were there as towerman, what was the custom and practice with reference to the use of that track down as far as the tower for switching purposes or for any purpose? A. That track has to be blocked.

"Q. (By the Court): What was the practice in November, 1901? A. As near as I can remember it was always done while I was there. If I was in the tower I always made it my business to do it before I gave them the switches."

In cross-examination of the witness, McGrevy, this question is asked:

"Q. Wasn't it your duty to see that the trains were kept moving through the yard? A. Yes, sir.

"Q. To give orders to move and see that everything was as clear as possible? A. Yes, sir.

"Q. You were in the habit of giving orders to the men through the yard? A. Yes, sir; whenever it was necessary.

"Q. Were these men accustomed to obey your orders? A. Yes, sir.

"Q. How long had you been doing this? A. Ever since I was in the tower.

"Q. Had you been doing that in the presence of the yardmaster at times? A. I do not know that I ever saw the yardmaster present at the time.

"Q. From whom did you get your orders to do those things, the yardmaster? A. Yes, sir.

"Q. He has been frequently in the yard while you were doing that work? A. He has been on the ground, but I do not remember his being in the tower.

"Q. He could see the way you were carrying on your business? A. Yes, sir.

"Q. Did you not frequently send a man over the west bound track? (Objection.) A. Yes, sir.

"Q. Didn't the yardmaster at frequent times tell you to use your own judgment in giving orders—to send trains as you saw fit? A. Yes, sir.

"Q. Did you frequently call out to Burtscher and the other engineers and order them to go in a given direction? A. They had the switches to go up, it was not necessary for me to call out to them.

"Q. Did you frequently give them orders? A. I did when I thought it was necessary.

"Q. Did they obey your orders? A. Yes, sir.

"Q.  (By the Court) :  What do you mean by an order such as you say you gave?  A.  If I wanted a man to go on a certain track and the switch was given to him and he did not go, I would tell him that the switch was given for a certain track, if I thought he was not familiar with the switches.

"Q.  (By Mr. Thatcher) :  Would the men go where you ordered them under those circumstances?  A.  Yes, sir.''

There is other testimony by Smith, the conductor, and Dunham, the fireman, bearing upon the question.

Now, when we remember that the duties of the train dispatcher are not to make a schedule, but simply to direct the movement of trains, it would seem as if the towerman had duties, which, upon a small scale are, as to a limited part of the road, very analagous to those of a train dispatcher; and, while the train dispatcher is not precisely, like a conductor, the direct superior of an engineer who has to obey him, he does, I think, under the general current of authority, stand in the relation of vice-principal as defined in the encyclopedia, in the part to which I have referred.  I see no reason why a distinction should be drawn between these duties performed by the towerman and those of the train dispatcher, because they are, over a limited area of the defendant's road, very similar, and he represents the company to the same extent.  The company is charged with the general duty of providing a reasonably safe place for the movements of its trains, for employes to work.  Some of the courts have placed the liability of the company under such circumstances upon that principle, the duty of the company to provide a reasonably safe place to work.  I do not know that the Supreme Court of Ohio has ever applied that principle to this particular kind of a case.  But, upon the whole, remembering the rule laid down in *Pitts., Ft. W. & C. Ry.* v. *Lewis,* 33 O. S., 196, and *Ry.* v. *Margrat,* 51 O. S., 130, that the relationship as to superiority is to be determined in each case by the evidence in that case, that it is a question largely of fact, the court are unanimously of the opinion that the issue was properly one for the jury, and that there is no weight of evidence in this case against the theory contended for by the plaintiff, sufficient to justify any disturbance of the verdict.

The verdict is for $13,500. It is perhaps a larger amount than the judges would have allowed if the matter had been presented to them as triers of fact. But we can not say, under the circumstances of the case, the nature of the plaintiff's injury, the length of time that has elapsed since the injury was sustained, the fact that he was in the very prime of his manhood, when he received the injury, that he was earning $1,200 a year, and that he has been practically disabled from work, that the amount allowed by the jury is sufficient to indicate that they were influenced by passion or prejudice. Without that, the court could only proceed in making any modification of the verdict, in requiring any remittitur of any part of it, upon the theory that there has been some error of computation in determining the amount. But the amount is necessarily so indefinite, so difficult of ascertainment when we are dealing with such an injury as this, that it is not susceptible of such computation as may be made in many cases. One of the items entering into the assessing of damages is pain, physical and mental, that a man has suffered, and it is difficult to measure these things exactly in money. It must be largely a matter of discretion of the jury. And after a careful consideration of the whole question we have not thought best to disturb the verdict, notwithstanding the fact that it is somewhat larger than we should have been probably inclined to allow, had the matter been submitted to us in the first instance.

One of the judges of this court has made a computation, in order to ascertain what sum of money would purchase an annuity sufficient in amount for his livelihood during the years of his expectancy of life. We find that, looking at it from such a standpoint as that, the verdict is not very far in excess of the sum which would be necessary to purchase such an annuity. I mean to purchase an annuity which would be equal to the difference between his probable earnings during the residue of his life, or such time as he would be able to work, and the amount which he is now likely to be able to earn in his physical condition. We think the amount is not so far below the sum allowed by the jury as to justify us in saying that they might not

have considered such an amount and added to it compensation for the suffering which the man had sustained, the operations that have been performed upon him during the treatment of the medical attendant, who, I believe, in this case was the surgeon of the company, and presumably he has received as good attention as could possibly be obtained for him. I say that under all these circumstances we have not thought best to disturb the verdict of the jury.

The judgment of the court below will be affirmed, without penalty.

*E. D. Potter*, for plaintiff in error.

*C. A. Thatcher*, for defendant in error.